**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael E. Tennenbaum, | No. CV-10-02137-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Arizona City Sanitary District, a political subdivision of the State of Arizona; Francis J. Slavin PC, an Arizona corporation; Francis J. Slavin, husband; Carol J. Slavin, wife, | |
| Defendants. | |

Defendant Arizona City Sanitary District ("ACSD") has filed a Second Motion for Summary Judgment. (Doc. 169.) Defendants Francis J. Slavin PC, Francis J. Slavin, and Carol J. Slavin (collectively referred to in the singular as "Slavin") have likewise filed a Motion for Summary Judgment. (Doc. 171.) The Court denies both Motions.[1]

## BACKGROUND

Throughout 2008 and 2009, ACSD was embroiled in litigation with Arizona City Golf, LLC, over a contract governing water rights at a golf course in Arizona City, Arizona. (Doc. 172 ¶¶ 2, 17; Doc. 181 ¶¶ 2, 17.) Slavin was one of the attorneys that represented ACSD in the suit. (Doc. 181 ¶ 40.) Plaintiff Michael Tennenbaum was not party to the golf course lawsuit, and claims no involvement in it. (*Id.* ¶¶ 44–45.) The

---

[1] The Parties' requests for oral argument are denied because they have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group v. Pac. Malibu Dev.*, 933 F.2d 724, 729 (9th Cir. 1991).

history of the contractual rights involving ACSD's supply of effluent to the golf course and other facilities lies at the center of this case.

The long-simmering dispute about ACSD's supply of effluent to the golf course coincided with a bitter disagreement regarding the composition of ACSD's board of directors. (Doc. 183-3, Ex. 7-5.) Two separate recall efforts were made to unseat three of the five directors, one that began on January 7, 2009, and suffered from procedural defects, and another that was filed on October 8, 2009. (*Id.*; Doc. 183-4, Exs. 7-5, 7-14.) The recall efforts were motivated by dissatisfaction with ACSD's conduct of the litigation. (Doc. 183 ¶¶ 63–81.) ACSD Board members challenged the second recall effort in court on December 21, 2009. (Doc. 183-8, Ex. 13.)

It was in this context that ACSD, with the assistance of Slavin, drafted a letter to be sent to all 4,500 ACSD customers on December 30, 2009. (Doc. 181 ¶ 101.) On its face, the letter's purpose was "to clear up the misconception surrounding the current lawsuit between the Arizona City Sanitary District and Arizona City Golf."[2] (Doc. 1-1, Ex. 1.) It then chronicled the history of the dispute. It asserted that Tennenbaum owned Arizona City Development Corporation ("ACDC"), an entity that owned the golf course, country club, Happy Days Park, Paradise Lake, and the Racquet Club. (*Id.*) According to the letter, ACDC entered into an agreement with ACSD in 1979 that provided that ACSD would provide effluent to ACDC to irrigate those facilities as long as ACDC maintained them for the use of Arizona City residents and taxpayers. (*Id.*) ACDC formed Arizona City Club, Inc. (ACCI), and deeded all amenities to it, subject to a restriction that "the amenities would continue for 99 years", thus allowing Arizona City residents to enjoy the various attractions. (*Id.*)

The letter continued:

But beginning in 1994, Tennenbaum began taking those public amenities and selling them off for his own profit. Tennenbaum and his sons have sold

---

[2] It is not clear what the status of the lawsuit was at that time—the last notable event in the record shows that ACSD had filed an amended complaint on August 7, 2009. (Doc. 183-7, Ex. 8.)

off every public amenity listed in the agreement, including Arizona City's groundwater rights, for a profit of nearly $5 million. All of the amenities Tennenbaum agreed to maintain for public use are gone and now belong to private owners. The golf course has been privatized. Yet, it continues to use water intended for the benefit of all Arizona City residents and taxpayers.

What began as a mutually beneficial agreement between the District, Tennenbaum and the Arizona City residents is now for the sole benefit of Tennenbaum and his partners. Tennenbaum owns approximately 40 percent of the golf course and is owed about $700,000 by Arizona City Golf, secured by a mortgage against the golf course. Tennenbaum claims that the District must provide free reclaimed water forever!!

The District will continue to deliver water to the golf course during the lawsuit. At the end of this lawsuit, there will be a fair and balanced agreement put in place which will provide for Arizona City Golf to pay for reclaimed water. . . . The payment schedule will be phased in until such time when the Arizona City golf course owners will be paying for water the same as all other Arizona golf course owners and you will be relieved of this financial burden.

The Board will continue to fight for your rights, ensuring they will not stay forever in the hands of golf course owners and out-of-state developers who have their own interests—and bank accounts—in mind.

(*Id.*)

Tennenbaum claims that the letter contains a number of falsehoods. Specifically, he claims that the following statements were untrue: the nature of the contract between ACDC and ACSD, the formation of ACCI, that the Tennenbaums took the amenities and sold them for his own profit, that they sold all of the amenities for a profit of $5 million, that the amenities are no longer for public use, that the ACDC-ACSD agreement is now solely for the benefit of Tennenbaum, Tennenbaum's ownership of the golf course, and Tennenbaum's claim "that the District must provide free water forever." (Doc. 172 ¶ 6; Doc. 181 ¶ 6.) According to Tennenbaum, those statements falsely accuse him of "profiteering" and "gouging." (Doc. 172 ¶ 7; Doc. 181 ¶ 7.)

The letter appeared in the print and online versions of the Arizona City Independent TriValley newspaper, first on January 13, 2010, and again on January 20,

2010. (Doc. 172 ¶ 11; Doc. 181 ¶ 11.) ACSD held a regular public meeting on January 20, 2010, where it discussed the history detailed in the customer letter. (Doc. 172 ¶ 9; Doc. 181 ¶ 9.) The Chairman introduced Slavin, who stated that "all we're trying to do tonight is to tell you what we're all about in terms of the lawsuit. We think it would be very important for you to know that, only because there's been different versions explained out in the community as to what's going on in this lawsuit." (Doc. 172 ¶ 10; Doc. 181 ¶ 10.) Slavin then gave a presentation that, according to the Parties' briefing, largely mirrored the statements made in the letters.

Tennenbaum brought this suit for defamation on October 6, 2010. (Doc. 1.) He claims that there were four separate defamatory statements, all with principally the same content: those made in the letter, the letter's republication twice in the newspaper, and Slavin's statements at the ACSD meeting. Defendants have moved for summary judgment.

## DISCUSSION

## I.   LEGAL STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S. at 248). Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

Substantive law determines which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[3] *Anderson*, 477 U.S. at 248. In addition, the dispute must be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury.") (citations omitted).

Furthermore, the party opposing summary judgment "may not rest upon the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); see also L.R.Civ. 1.10(l)(1) ("Any party opposing a motion for summary judgment must . . . set[ ] forth the specific facts, which the opposing party asserts, including those facts which establish a genuine issue of material fact precluding summary judgment in favor of the moving party."). If the nonmoving party's opposition fails to specifically cite to materials either in the court's record or not in the record, the court is not required to either search the entire record for evidence establishing a genuine issue of material fact or obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409, 1417–18 (9th Cir. 1988).

---

[3] The Parties agree that Arizona law applies here.

1    II.    **ANALYSIS**

2         Defendants jointly raise two defenses that they assert entitle them to summary

3    judgment: (1) the statements are not capable of defamatory meaning and (2) even if they

4    are, the statements are protected by an absolute judicial privilege. ACSD asserts two

5    additional defenses: (1) the statements made at the meeting are protected by the absolute

6    legislative privilege, and (2) Tennenbaum has not produced sufficient evidence of malice

7    to defeat summary judgment. Finally, Slavin has moved for summary judgment on

8    Tennenbaum's claim against him for the publication of the statements in the newspapers.[4]

9         **A.    Capability of Conveying Defamatory Meaning**

10        "'To be defamatory, a publication must be false and must bring the defamed

11   person into disrepute, contempt, or ridicule, or must impeach plaintiff's honesty,

12   integrity, virtue, or reputation.'" *Turner v. Devlin*, 174 Ariz. 201, 203–04, 848 P.2d 286,

13   288–89 (1993) (quoting *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341, 783

14   P.2d 781, 787 (1989)). At this point in the litigation, the Parties are proceeding on the

15   assumption that the statements challenged by Tennenbaum were in fact false. What

16   Defendants contest is whether those statements were defamatory.

17        "The trial court decides, in the first instance, whether, under all the circumstances,

18   a statement is capable of bearing a defamatory meaning. The jury then decides whether

19   the defamatory meaning of the statement was in fact conveyed." *Yetman v. English*, 168

20   Ariz. 71, 79, 811 P.2d 323, 331 (1991) (internal citation omitted). Insulting or offensive

21   statements are typically insufficient. *See* W. Page Keeton, et al., *Prosser & Keeton on the*

22   *Law of Torts* § 111 (5th ed. 1984). Something beyond insult is required: "A judge and

23   jury will probably require that a statement be derogatory, degrading, and somewhat

24   shocking, and that it contain elements of personal disgrace; they will not waste their time

25   _____

26        [4] Tennenbaum has asserted both defamation and invasion of privacy claims based
     on the statements. No Party has differentiated between the two classes of claims for
27   purposes of this Motion and the Court follows the Parties' lead on this issue. The Court
     likewise follows the Parties' practice of referring to both libel and slander claims as
28   "defamation."

with mere slights or insults." 1 Robert D. Sack, *Sack on Defamation* § 2.4.1 at 2-18 (4th ed. 2012) (internal quotation marks omitted). A court is not required to strain and stretch the meaning of the statements in order to unearth some potential defamatory meaning. *See Lawrence v. Evans*, 573 So. 2d 695, 698 (Miss. 1990) ("If the reader must struggle to see how and whether they defame, by definition the words are not defamatory in law. Words which may be found defamatory only with the aid of 'a most vivid imagination' are not actionable.").

Context matters. Isolated statements lifted from a longer communication will not do. "It is true that a defamatory meaning must be found, if at all, in a reading of the publication as a whole." *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998) (interpreting California law); *Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir. 2005) ("When evaluating the threshold question of whether a statement is reasonably capable of sustaining a defamatory meaning, we must interpret that statement from the standpoint of the average reader, judging the statement not in isolation, but within the context in which it is made."). In addition, it is appropriate to examine the statements' target audience. *See Rudin v. Dow Jones & Co.*, 557 F. Supp. 535, 543–46 (S.D.N.Y. 1983).

Defendants' principal argument is that the statements Tennenbaum claims are defamatory are nothing more than simple recitations of beneficial commercial transactions. The letter describes how Tennenbaum molded a contract with ACSD to inure to his own benefit, and, while that may anger the public, statements that an individual aggressively pursued his financial self-interest are not likely to be defamatory. *Cf. Wilkow v. Forbes, Inc.*, 241 F.3d 552, 557 (7th Cir. 2001) ("Although a reader might arch an eyebrow at Wilkow's strategy, an allegation of greed is not defamatory; sedulous pursuit of self-interest is the engine that propels a market economy."). If the statements in the letter were indeed mere recitations of advantageous dealing, they would not be capable of "bring[ing] the defamed person into disrepute, contempt, or ridicule, or . . .

impeach[ing] plaintiff's honesty, integrity, virtue, or reputation.'" *Turner*, 174 Ariz. at 203–04.

Yet the statements here go further. Read in context of the letter, the statements assert that Tennenbaum breached his contract with ACSD by privatizing supposedly public amenities ("Tennenbaum began taking those public amenities and selling them off . . . , Tennenbaum and his sons have sold off every public amenity listed in the agreement. . . . All of the amenities Tennenbaum agreed to maintain for public use are gone and now belong to private owners"), profited from that privatization ("selling them off for his own profit", "for a profit of nearly $5 million"), and now seeks to force ACSD to continue to hold up its end of the bargain by providing those amenities at taxpayer expense ("Yet it continues to use water intended for the benefit of all Arizona City residents and taxpayers . . . . Tennenbaum claims that the District must provide free reclaimed water forever!!"). (Doc. 1-1, Ex. 1.) These accusations go beyond grumbles of dogged self-interest or economic savvy. A jury could find that the letter accuses Tennenbaum of being a promise-breaker, cheat, bully, deceiver, and a dishonest businessman. Those interpretations of the statements would go directly to Tennenbaum's honesty, integrity, and reputation in the community.

Furthermore, the context in which these statements were made is relevant. Arizona City residents were concerned about the ACSD litigation and its effect on the golf course and their tax rates. (Doc. 170 ¶¶ 4–6; Doc. 183 ¶¶ 4–6.) One of the residents, Scott Waddle, a one-time owner of AM Golf, LLC (a previous owner of the golf course), stated that he was "concerned about what type of individual [Tennenbaum] was" after receiving the letter because "[t]hey painted him to be a shyster . . . . Somebody that takes advantage of the public, of the people, the Commonwealth. Bottom feeder, I guess." (Doc. 181-7, Ex. 10 (Waddle Dep.) at 118:16–119:3.) The letter created doubts in Waddle's mind as to whether he would do business with Tennenbaum in the future. (*Id.* at 121:15–20.) Others

mistakenly thought that Waddle was in business with Tennenbaum and refused to do business with Waddle on that basis.[5] (*Id.* at 121:24–122:12.)

Similarly, attendees of the ACSD meeting where Slavin rehearsed points similar to those in the letter thought the statements implied Tennenbaum was dishonest. Greg Mellum stated that "[Slavin] implied that, that he sold this and he sold that and he took all the money, you know. . . . By what he was implying through his presentation he kept saying that Tennenbaum took this, Tennenbaum took this, Tennenbaum took that, sold it for his own benefit." (Doc. 181-9, Ex. 15 (Mellum Dep.) at 66:13–21.) While Mellum admitted to not understanding the "legalese", he "remembered that [Slavin] went line by line why Tennenbaum took advantage of us taxpayers in Arizona City." (*Id.* at 67:9–69:3, 106:17–18.) The point conveyed was "[t]hat Tennenbaum came down here and raped this community by selling the racquet club, the park, and all this other stuff." (*Id.* at 138:17–25.) Monalisa Wilmot, another attendee of the meeting and active participant in the Arizona City community, said that she thought less of Tennenbaum after the meeting because "he would make a $4.5 million gain on the community. That didn't appeal to me. And it made it sound like he was taking the community for everything he could get and then just getting out." (Doc. 181-9, Ex. 16 (Wilmot Dep.) at 147:9–17.)

These statements provide further evidence that the statements in the letters (reprinted in the newspapers) and at the presentation were capable of bearing a defamatory meaning. Read together in the letter, the statements could paint a picture of Tennenbaum as a dishonest businessman who was trying to siphon off the tax dollars of Arizona City residents. Read or heard in the context of the public concern over the ACSD litigation, that meaning could further cement itself as the dominant message. Defendants apparently argue that "communications suggesting a plaintiff has profited or furthered his personal economic interests—whether through direct accusations, subjective opinions, or

---

[5] Defendants object to Waddle's comments as irrelevant to their Motions. But because context is a factor in deciding whether a statement was capable of defamatory effect, the Court will consider how the public perceived those comments.

mere innuendo—[are] not defamatory as a matter of law." Perhaps the argument may be true as to legitimate gain of profits, but the statements at issue here have strong intimations that Tennenbaum's claims were ill-gotten. Therefore, the Court concludes that the statements were capable of conveying a defamatory meaning.

## B.    Absolute Judicial Privilege

Even defamatory statements can nonetheless be "privileged," and allow the speaker or writer to escape liability. One of these privileges is the judicial privilege. It protects defamatory publications that "relate to, bear on or [are] connected with the proceeding." *Green Acres Trust v. London*, 141 Ariz. 609, 613, 688 P.2d 617, 621 (1984). Traditional examples of protected defamatory publications include statements made in court filings. *See id.* (complaint, motions, lis pendens). "The defense is absolute in that the speaker's motive, purpose or reasonableness in uttering a false statement do not affect the defense. Whether the privilege exists is a question of law for the court. . . ." *Id.* (internal citation omitted). Defendants argue that the statements made in the letters, newspaper publications, and at the presentation were absolutely privileged because they related to the lawsuit between ACSD and the golf course.

"We believe that both [1] content and [2] manner of extra-judicial communications must bear some relation to the proceeding." *Id.* at 614 (internal quotation marks omitted). One of the key factors in analyzing the manner of the communication is the identity of the recipient. "[I]n our view the recipient must have had a close or direct relationship to the proceeding for the privilege to apply. Exactly how close or direct that relationship . . . can only be determined on a case-by-case basis." *Hall v. Smith*, 214 Ariz. 309, 313, 152 P.3d 1192, 1196 (Ct. App. 2007). For example, comments made to a newspaper reporter lacked a sufficient connection to the litigation. *Green Acres*, 141 Ariz. at 614–15.

In approaching these questions, courts should be guided by "the underlying principle that the privilege should be applied to promote candid and honest communication between the parties and their counsel in order to resolve disputes." *Hall*,

214 Ariz. at 313 (internal quotation marks omitted). Indeed, the Arizona Supreme Court has stressed that the statement "'*be made in furtherance of the litigation and to promote the interest of justice*.' Without that nexus, the defamation only serves to injure reputation." *Green Acres*, 141 Ariz. at 613–14 (quoting *Bradley v. Hartford Accident & Indem. Co.*, 106 Cal. Rptr. 718, 723 (1973) (emphasis in original)). "'The salutary policy of allowing freedom of communication in judicial proceedings does not warrant or countenance the dissemination and distribution of defamatory accusations outside of the judicial proceeding.'" *Id.* at 614 (quoting *Asay v. Hallmark Cards, Inc.*, 594 F.2d 692 (8th Cir. 1979)).

The letter, and therefore the statements in the newspaper reprints, clearly related to a judicial proceeding. It was "intended to clear up the misconception surrounding the current lawsuit between the Arizona City Sanitary District and Arizona City Golf." (Doc. 1-1, Ex. 1.) It set forth ACSD's version of the history of its contract and why subsequent events led ACSD to file a lawsuit. The content of the letter therefore bore "some relation to the proceeding." *Green Acres*, 141 Ariz. at 614. Tennenbaum's argument that the letter was not about the litigation and was in fact a disguised campaign communication relating to the recall misses the point. On its face, the letter addresses the ongoing litigation. The subjective motivations behind the statements are irrelevant. *Id.* at 613. There is no reason to believe that the statements made at the public meeting were any different in their content and relationship to the underlying litigation.

Nevertheless, the manner of all three communications was not such that it furthered the litigation or the interests of justice. The letter was sent to all 4,500 ACSD customers. (Doc. 170 ¶ 1; Doc. 183 ¶ 1.) ACSD customers pay a monthly bill to ACSD for their water usage. They are also, apparently, allowed to elect or recall members of the ACSD Board. All Parties refer to these individuals as merely "customers" or "taxpayers." It is difficult to ascertain how 4,500 ACSD customers or taxpayers would have a "close or direct relationship to the" litigation between their utility, ACSD, and Arizona City

1   Golf such that absolute judicial immunity should be imposed. *Hall*, 214 Ariz. at 313.

2   ACSD customers are not parties, directly or indirectly, to that lawsuit.

3          The lack of a sufficient relationship is even more apparent with regard to the

4   statements in the newspapers and those made at the public meeting. The newspapers were

5   circulated to all Arizona City citizens, some of whom may not be ACSD customers. The

6   same principle applies to the presentation, which was open to the public due to the

7   newspaper announcement but likely attended by ACSD customers. None of these groups

8   had any involvement in or direct control over the litigation. Their relationship to the

9   underlying litigation is therefore quite tenuous.

10         Defendants argue that the recipients of the statements were interested in the

11  litigation and could potentially be impacted by its outcome and that the community

12  interest plus potential financial impact is sufficient to invoke the absolute judicial

13  privilege. It is true that there is evidence that ACSD customers would be impacted

14  indirectly by the outcome of the litigation and were indirectly funding it through their tax

15  rates. (Doc. 172 ¶¶ 20–21; Doc. 181 ¶¶ 20–21.) But more is needed than general interest

16  or indirect impact. Otherwise any statement made by a government entity to a taxpayer

17  within its borders or a company or utility to its customers (or potential customers) on

18  pending litigation might be privileged. That potential trickle-down financial impact (and

19  resulting interest) is not enough.

20         Defendants rely chiefly on *Hall*, and the case is instructive here. There, the

21  defendant (CIGNA AZ) had published the allegedly defamatory statements to its parent

22  company (CIGNA). To resolve the application of the absolute litigation privilege, the

23  Court of Appeals looked "not on the relationship between CIGNA and CIGNA AZ, but

24  on the relationship between CIGNA and the litigation between Smith and CIGNA AZ."

25  *Hall*, 214 Ariz. at 314. It turned out that the parent company was not only interested in

26  the litigation, but was substantially involved in it. *Id.* ("[T]he record reflects that CIGNA

27  was significantly involved in the Smith–CIGNA AZ litigation."). For example, the parent

28  company sent its own employees to investigate the claims, selected the attorneys who

1   would defend the case, and "orchestrated the defense" itself. *Id.* There, the potential

2   financial impact was direct. *Id.* at 315.

3       This case is not like *Hall*. The recipients of the allegedly defamatory statements

4   had, at best, a tangential relationship to the litigation involving ACSD. *Hall* did not focus

5   on the parent company's trickle-up financial interest in the litigation; instead, the core

6   question centered on the extent of the parent company's involvement in the litigation.

7   Financial interest was insufficient. Here, the customers or taxpayers who received the

8   statements have, at most, an indirect financial interest. *Hall* does not direct application of

9   the judicial privilege to the statements here.

10      Nor do the other cases cited by Defendants lead to a different result. They cite a

11  California case, but California has a statutory judicial privilege and interpretations of that

12  statute are not very persuasive in Arizona. *See id.* at 313 (declining to examine California

13  cases interpreting California's judicial privilege statute). The same goes for the other

14  state cases that applied different state standards. Notably, Defendants cite a Colorado

15  Court of Appeals case where the judicial privilege applied to a homeowner's association

16  that wrote an allegedly defamatory statement to its members. *See Club Valencia*

17  *Homeowners Ass'n, Inc. v. Valencia Assocs.*, 712 P.2d 1024 (Colo. Ct. App. 1985).

18  Crucially, that letter asked the members to assign their individual causes of action to the

19  association. *Id.* at 1025. The statement would then have a direct effect on the pending

20  litigation—the members of the homeowners association were the holders of the cause of

21  action—and therefore made the association's members sufficiently interested in the

22  litigation to justify imposing the absolute judicial privilege.

23      The guiding fact here is that ACSD does not sufficiently identify how the

24  communications "promoted candid and honest communication between the parties and

25  their counsel in order to resolve disputes . . . ." *Hall*, 214 Ariz. at 313. None of the

26  communication recipients were parties. Nor did the communications further "socially

27  important interests . . . [like] the fearless prosecution and defense of claims which leads

28  to complete exposure of pertinent information for a tribunal's disposition." *Green Acres*,

141 Ariz. at 613. It is true that the utility's customers may have had a legitimate interest in understanding the position of the ACSD concerning the suit, but, under the circumstances, that interest was not so direct as to shield defamatory statements made to virtually an entire community under the doctrine of judicial immunity.  Defendants seek a broad interpretation of the judicial privilege, but Arizona has "narrowly construed the requirement that the act raising the privilege have a close, direct relationship to such proceedings." *Chamberlain v. Mathis*, 151 Ariz. 551, 558, 729 P.2d 905, 912 (1986).

Because the Court concludes that the judicial privilege does not apply to the communications, it does not address Tennenbaum's contention that any privilege may have been dispelled by excessive publication.

### C.     Absolute Legislative Privilege

ACSD claims that the absolute legislative privilege applies to the statements made by Slavin at the ACSD meeting held on January 20, 2010. "By constitutional mandate, an absolute legislative immunity protects statements made by federal and Arizona legislators during formal legislative meetings." *Sanchez v. Coxon*, 175 Ariz. 93, 95–96, 854 P.2d 126, 128–29 (1993) (citing U.S. Const. Art. I, § 6, cl. 1; Ariz. Const. Art. IV, pt. 2, § 7). The Arizona Supreme Court has also extended that protection to statements made by a city council member at a formal council meeting. *Id.* at 97. All of these bodies perform core legislative functions—passing laws and ordinances.

While the Arizona legislature has delegated legislative authority to ACSD to "[f]ormulate and adopt rules" governing various sewer and water functions, Ariz. Rev. Stat. § 48-2011, the ACSD does not identify how the meeting on January 20, 2010 related to any such functions. The entirety of that meeting was devoted to discussing a lawsuit that did not relate to the formulation or adoption of rules governing sewer and water functions. Nor is there evidence such action was contemplated by the meeting. Because the subject of the meeting was unrelated to ACSD's delegated legislative powers, no legislative immunity attaches to the statements made at the meeting.

**D.     Need for Actual Malice**

ACSD claims that Tennenbaum must show actual malice in order to prevail on his defamation claim. It asserts two rationales. First, ACSD claims that its director, Miller, is entitled to qualified (as opposed to absolute) immunity for the statements. The Arizona Supreme Court has shielded public officials with qualified immunity in defamation cases "when officials are setting policy or performing an act that inherently requires judgment or discretion." *Chamberlain*, 151 Ariz. at 555. The official can nevertheless forfeit that immunity if, among other things, "he . . . acted with malice in that he knew his statements regarding plaintiffs were false or acted in reckless disregard of the truth." *Id.* at 560; *see also Burns v. Davis*, 196 Ariz. 155, 165, 993 P.2d 1119, 1129 (Ct. App. 1999) ("An abuse through actual malice occurs when the speaker makes a statement knowing it is false or with reckless disregard of whether it is false."). Miller, however, is not a party to this case. His government employer, ACSD, is. Immunity only attaches to public officials, not to public agencies. *See Grimm v. Ariz. Bd. of Pardons and Paroles*, 115 Ariz. 260, 263–68, 564 P.2d 1227–1235 (1977) (applying qualified immunity to board members); *Portonova v. Wilkinson*, 128, Ariz. 503–04, 627 P.2d 232–34 (1981) (recognizing availability of immunity for a police officer); *Chamberlin*, 151 Ariz. at 554–60 (recognizing immunity for public officials). Qualified immunity, therefore, is not at issue in this suit and cannot justify a requirement that Tennenbaum show malice.

ACSD's second reason for why Tennenbaum must show malice is that he is a public figure and the speech in question was on a matter of public concern. And when a plaintiff is a public figure and the allegedly defamatory statements raise matters of public concern, he must establish actual malice by clear and convincing evidence. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986). That heightened standard affects how the Court evaluates the case at the summary judgment stage. *See id.* at 257 ("In sum, a court ruling on a motion for summary judgment must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists—that is, whether the evidence presented is such that a reasonable jury

might find that actual malice had been shown with convincing clarity."); *New York Times v. Sullivan*, 376 U.S. 254, 280 (1964).

Yet Tennenbaum did not address ACSD's argument that he is a limited-purpose public figure, see *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352 (1974), and that the matter in question was a matter of public concern. He simply announced his opposition. The Court therefore assumes that ACSD is correct.[6] To succeed on his defamation claim, Tennenbaum must produce sufficient evidence from which a reasonable jury could conclude by clear and convincing evidence that ACSD acted with actual malice—that the statements were false and ACSD knew they were false at the time they were made. *See Anderson*, 477 U.S. at 255–56. Tennenbaum may prove malice through circumstantial evidence. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989).

Tennenbaum has carried his burden sufficient to defeat summary judgment. He chiefly relies on deposition evidence that Miller, ACSD's director, allegedly knew that the letter (and therefore the presentation derived from the letter) contained numerous false statements.[7] The letter made the following claims. ACSD entered into a contract with ACDC, owned by Tennenbaum, for the provision of reclaimed water. (Doc. 1-1.) The agreement required ACDC to maintain certain amenities—such as a golf course, park, lake, and racquet club—for the use and enjoyment of Arizona City residents and taxpayers. (*Id.*) ACDC then formed ACCI, and deeded all the amenities to ACCI. (*Id.*)

---

[6] *Gertz* instructs a court "to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." 418 U.S. at 352. For example, a real estate developer was sufficiently involved in the public debate and negotiations surrounding several tracts of land to be considered a public figure for purposes of that litigation. *See Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 8-9 (1970). Tennenbaum has disputed the extent of his involvement in the goings-on of Arizona City since the 1970s, but there is sufficient evidence at this stage to assume that he maintained involvement in the subsequent transactions to likely give rise to limited public figure status. In addition, the litigation between ACSD and the golf course appears to be a matter of public concern. There is evidence that many Arizona City residents were concerned and ACSD held a number of meetings and hearings on the subject.

[7] While Miller's statements may not function as legally binding admissions on behalf of ACSD, see Restatement (Second) of Agency § 14C, those statements are important evidence for purposes of evaluating motions for summary judgment.

That deed contained a restriction that "ensur[ed] that these amenities would continue for 99 years." (*Id.*) In 1994, however, Tennenbaum and his sons began selling the public amenities off for profit, eventually selling all of the amenities and the groundwater rights for a profit of $5 million. (*Id.*) Tennenbaum owns 40% of the golf course and is owed around $700,000 by the golf course, secured by a mortgage against the course. Tennenbaum claimed that ACSD must provide free water in perpetuity. (*Id.*)

The Amended Complaint filed in the action between ACSD and the golf course that gave rise to this claim—and that Tennenbaum claims is much more accurate—lays out a different story. ACCI was incorporated in 1979 to hold, operate, and maintain the amenities. (Doc. 183-7, Ex. 8 ¶¶ 33–35; Doc. 181 ¶ 48.) ACDC conveyed the amenities to ACCI in 1979. (Doc. 183-7, Ex. 8 ¶ 36; Doc. 181 ¶ 48.) In 1994, ACCI sold the racquet club to ACDC, and ACDC sold it to a developer. (Doc. 183-7, Ex. 8 ¶ 43; Doc. 181 ¶ 48.) In March 2001, ACCI transferred the park to Tennenbaum, who then conveyed it to School District No. 22. (Doc. 183-7, Ex. 8 ¶ 44; Doc. 181 ¶ 48.) ACCI transferred the lake to a small group of homeowners in July 2004. (Doc. 183-7, Ex. 8 ¶ 45; Doc. 181 ¶ 48.) Finally, the golf course and groundwater rights were conveyed to AM Golf, LLC, which then sold the golf course to Arizona City Golf, LLC, and the groundwater rights to Aqua Capital Management. (Doc. 183-7, Ex. 8 ¶¶ 46–48; Doc. 181 ¶ 48.) Important to this evaluation is the fact that the members of AM Golf are Andrew and Mark Tennenbaum, Tennenbaum's sons, (Doc. 183-7, Ex. 8 ¶ 3; Doc. 181 ¶ 48), and Tennenbaum was the sole shareholder of ACDC until it dissolved around 1995 (Doc. 181-1, Ex. 1 at 21:17–19, 75:19–25, 87:12–88:5; *id.*, Ex. 3 at 170:17–24).

At his deposition, Miller stated that he did not know whether many of the statements made in the letter were untrue. (Doc. 183-2, Ex. 4 (Miller Dep.) at 131:12–20, 159:11–20, 160:1–24.) A review of his deposition shows that he depended substantially on the work of Slavin, ACSD's counsel, for research into the veracity of the statements. Miller also stated throughout his deposition that the letter likely omitted important information. Nevertheless, Miller directly admitted that the following statements were not

true: (1) Tennenbaum and his sons sold off all the amenities (ACCI, and not Tennenbaum or his sons, sold the lake) (*id.* at 167:16–23, 169:19–25); (2) Arizona City residents were somehow part of the initial agreement between ACSD and ACDC and owned the groundwater (they were not) (*id.* at 189:15–191:14); (3) the agreement is now for the sole benefit of Tennenbaum and his partners (it is not)  (*id.*); (4) Tennenbaum owns some portion of the golf course (he does not) (*id.*); and (5) Tennenbaum is claiming that ACSD has to provide free water (the golf course owner is claiming that and Tennenbaum does not own any portion of the golf course) (*id.* at 192:18–193:18). These are core claims in the letter and presentation.

Miller also conceded that the letter speaks of Tennenbaum and his sons acting when in fact they acted through entities that they owned—ACDC (Tennenbaum) and AM Golf (his sons). (*Id.* at 164:14–165:2, 166:22–167:23.) While this makes other statements in the letter technically untrue, e.g., ACDC, not Tennenbaum, bought and sold the racquet club; AM Golf, not Tennenbaum's sons, bought and sold the golf course and groundwater rights, those inaccuracies do not show malice. (*Id.* at 171:7–12, 188:14–189:7.) *See Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 355, 819 P.2d 939, 941 (1991) ("Slight inaccuracies will not prevent a statement from being true in substance, as long as the 'gist' or 'sting' of the publication is justified.") It is well-accepted to speak colloquially of Donald Trump or Warren Buffet purchasing or selling a company, even though they are acting through corporations they control. That same practice would apply to the statements made in the letter.

Yet even taking that practice into account, Miller admitted that several crucial statements in the letter were untrue. To be proper evidence of malice, there must be evidence that ACSD knew those statements were untrue at the time they were made, in December 2009 and January 2010. *See Chamberlain*, 151 Ariz. at 560. While the tangle of ownership interests in play may create some level of confusion, there is substantial evidence that ACSD knew who owned, bought, and sold what. ACSD had copies of all the deeds. Indeed, its amended complaint in the lawsuit against Arizona City Golf lays

out a very different version of the events and shows that Tennenbaum was not involved in many of the transactions. (Doc. 183-7, Ex. 8.) In light of this evidence, it is difficult for ACSD to claim ignorance of what had happened to the Arizona City amenities. ACSD filed complaints, submitted declarations and statements, and produced a brochure that all relayed that different individuals or entities owned the properties ascribed to Tennenbaum in the letter. (Doc. 183-7, Ex. 8; Doc.183-8, Exs. 12-11, 13; Doc. 183-9, Ex. 20.) Its attorney in the litigation performed extensive research, even producing a 77-page timeline.[8] (Doc. 170 ¶¶ 18–19, 21–22; Doc. 183 ¶¶ 18–19, 21–22.) Moreover, notes from a litigation meeting reveal that ACSD may have been using Tennenbaum as a lightning rod for its public relations battle. "Our job (the District)—there has to be a bad guy on the golf side—will that be Michael Tennenbaum and Mark Tennenbaum—Mark Tennenbaum is the typical arrogant rich kid." (Doc. 183-8, Exs. 11–13.)

Because there is evidence from which a jury could conclude—even under the heightened standard—that ACSD acted with malice in making certain unprivileged statements in the letter, and those unprivileged statements were capable of conveying defamatory meaning, summary judgment is unwarranted on Tennenbaum's claims against ACSD.

### E.    Slavin's Involvement in Newspaper Publication

Slavin alone asserts that he was not involved in the subsequent publication of the letter in the newspapers and asks the Court to grant summary judgment on Count Two (Libel/Libel *Per Se*—Newspaper Articles) against him. Slavin is correct that involvement in the publication of an article is a necessary element of any defamation claim. *See, e.g.*, *Dube v. Linkins*, 216 Ariz. 406, 417, 167 P.3d 93, 104 (Ct. App. 2007). The issue here, however, is one of republication—Slavin does not contest his involvement in the original publication of the letter to ACSD customers.

---

[8] Miller has both admitted and denied that he knew that certain statements were false at the time he made them. (Doc. 183-2, Ex. 4 (Miller Dep.) at 188:14–189:7; Doc. 170-3, Ex. 12 ¶ 10.)

When it comes to the liability of an original publisher for subsequent publications of a defamatory statement, the Arizona Court of Appeals has relied on Restatement (Second) of Torts § 576. *Dube,* 216 Ariz. at 420. Section 576 states that "[t]he publication of a libel or slander is a legal cause of any special harm resulting from its repetition by a third person if, but only if, (a) the third person was privileged to repeat it, or (b) the repetition was authorized or intended by the original defamer, or (c) the repetition was reasonably to be expected." In other words, the original publisher can be liable for special damages (economic or pecuniary harm) arising from republication if one of the three criteria are met.

None of the Parties argue that the newspaper was privileged to repeat the letter. The first criteria is therefore not at issue. As to the second, Slavin specifically instructed ACSD not to provide the letter to local newspapers. (Doc. 172-4, Ex. 8-12.) Tennenbaum has not produced any evidence that Slavin was involved in, encouraged, or otherwise facilitated the newspaper publication. Therefore, Tennenbaum has failed to raise a genuine issue of material fact as to the second criteria. Nevertheless, there is a genuine issue of material fact as to whether Slavin, despite his specific instructions to ACSD not to give the letter to local newspapers, could reasonably expect subsequent publication. The events of the litigation were a matter of public concern, and the letter was widely circulated, which raises questions about whether Slavin should have known that the material would be published. Indeed, comment d to § 576 elaborates on this point:

> The originator is liable, although he did not intend the repetition, if he had reason to expect that it would be so repeated. In determining this, the known tendency of human beings to repeat discreditable statements about their neighbors is a factor to be considered. So too, if the originator has himself widely disseminated the defamation and thus intimated to those who heard it that he is not unwilling to have it known to a large number of people, the fact may be taken into account in determining whether there were grounds to expect the further dissemination of the slander.

Because there is a genuine issue of material fact as to whether Slavin should have known the letter would be republished, summary judgment for Slavin on Count Two is inappropriate.

### CONCLUSION

The statements at issue in this case are capable of conveying defamatory meaning, and no absolute privilege attaches to them. Moreover, Tennenbaum has created a genuine issue of material fact as to whether ACSD acted with malice in publishing the allegedly defamatory statements, even under the heightened evidentiary standard. And there remains a genuine issue of material fact as to Slavin's liability for the newspaper publications.

**IT IS THEREFORE ORDERED** that ACSD's Motion for Summary Judgment (Doc. 169) is **DENIED.**

**IF IS FURTHER ORDERED** that Slavin's Motion for Summary Judgment (Doc. 171) is **DENIED.**

Dated this 3rd day of June, 2013.


_____
G. Murray Snow
United States District Judge